**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON

JUNE 11, 2026

CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JUNE 11, 2026

SARAH R. PENDLETON
SUPREME COURT CLERK

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| GEOFFREY G. MCLELLAN AND JACKSON W. HOLLOWAY, | ) ) ) | |
| Respondents, | ) ) | No. 103799-6 |
| v. | ) ) | |
| | ) | En Banc |
| NICHOLAS W. BROWN, Attorney General, Washington State, | ) ) ) | |
| Petitioner. | ) ) | Filed: June 11, 2026 |

GONZÁLEZ, J.—Our constitutions protect a law-abiding individual's right to bear arms. U.S. CONST. amend II; WASH. CONST. art. I, § 24. From the beginning of our republic, that right has been subject to important, long-standing limitations. *District of Columbia v. Heller*, 554 U.S. 570, 626-27, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008). For example, the United States Supreme Court has noted long-standing limitations on concealed weapons. *See id.* at 626. Courts have also held that the Second Amendment attaches only to weapons "'in common use'" because "that limitation is fairly supported by the historical tradition of prohibiting the

carrying of 'dangerous and unusual weapons.'" *Id.* at 624, 627 (quoting *United States v. Miller*, 307 U.S. 174, 179, 59 S. Ct. 816, 83 L. Ed. 1206 (1939)). Perhaps most relevant to us today, the Court has recognized that "longstanding prohibitions on the possession of firearms by felons and the mentally ill" are presumptively constitutional. *Id.* at 626.

Under the Second Amendment, Geoffrey McLellan and Jackson Holloway argue a Washington law that temporarily prohibits them from possessing firearms as a consequence of their multiple driving under the influence (DUI) convictions within seven years is unconstitutional as applied to them. We granted direct interlocutory review to determine whether that temporary prohibition violates the Second Amendment. We conclude it does not.

## BACKGROUND

Washington law limits the firearm rights of several categories of people that our legislature has determined pose a special danger of misuse of firearms. RCW 9.41.040. Relevantly, Washington law temporarily prohibits anyone convicted twice within seven years of a DUI offense from possessing a firearm. RCW 9.41.040(2)(a)(i)(D).[1] People who have been legally disarmed under this statute

---

[1] In addition, DUI-related "prior offenses" trigger the possession prohibition, including physical control of a vehicle while under the influence, vehicular homicide and assault, reckless driving and negligent driving if amended from an original DUI charge, and several other vehicle operation offenses involving alcohol or drugs, even if they are later amended to exclude mention of alcohol or drugs or if prosecution or sentencing is deferred. RCW 46.61.5055(14)(a)(i)-(xvii).

may petition to have their firearm rights restored after five years of law-abiding behavior in the community. RCW 9.41.041(2)(a)(i)(I). During hearings on the proposed bill before it became law, the legislature considered studies about the correlation between alcohol abuse and future gun violence. *See, e.g.*, Hr'g on H.B. 1562 Before the S. L. & Just. Comm. (Wash. Mar. 21, 2023), at 45 min., 20 sec. to 45 min., 30 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://tvw.org/video/senate-law-justice-2023031425/?eventID=2023031425; *see also* LAWS OF 2023, ch. 295, § 1(4) (justifying restriction because "frequent risky alcohol use" is a "particularly strong risk factor[ ] for future violence").

McLellan was convicted of DUI three times within seven years, and Holloway was convicted of DUI twice within seven years. They applied for concealed carry permits, which were denied under RCW 9.41.040. In response, they brought a declaratory judgment action challenging RCW 9.41.040, as applied to them, for violating their Second Amendment rights.[2] The trial court denied the State's motion for judgment on the pleadings, but granted the State's alternative CR 56(f) request to permit further factual development, ruling that "[t]here are

---

[2] McLellan and Holloway brought this case as a mandamus action against the Spokane Police Department. The trial court correctly concluded that the department did not have a clear duty to act, denied mandamus, and dismissed the department as a party. The State intervened to defend the constitutionality of RCW 9.41.040(2)(a)(i)(D).

McLellan and Holloway do not address the state constitution, and we do not consider whether article I, section 24 requires a different analysis.

material issues of fact regarding the application of the law to McLellan and

Holloway" and specifically whether their "possession of firearms poses a credible

threat to public safety." Clerk's Papers (CP) at 145-46 (citing *United States v.*

*Rahimi*, 602 U.S. 680, 702, 144 S. Ct. 1889, 219 L. Ed. 2d 351 (2024)).

The State successfully sought our direct interlocutory review.[3]

ANALYSIS

The Second Amendment provides, "A well regulated militia, being

necessary to the security of a free state, the right of the people to keep and bear

arms, shall not be infringed." U.S. CONST. amend. II.[4] The Second Amendment

secures a "general right" to possess and carry arms for lawful purposes such as

self-defense. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 31, 142 S. Ct.

2111, 213 L. Ed. 2d 387 (2022). That right is among the "fundamental rights

necessary to our system of ordered liberty." *McDonald v. City of Chicago*, 561

U.S. 742, 778, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010). However, the United

---

[3] The trial court denied McLellan and Holloway's motion for summary judgment, and they did not seek this court's review of that denial.

[4] Because the State does not contend otherwise, we assume without deciding that McLellan and Holloway "are part of 'the people' protected by the Second Amendment." *See* Opening Br. of Nicholas W. Brown at 17 n.5.

States Supreme Court instructs us, that right "is not unlimited." *Heller*, 554 U.S. at 626.

The government bears the burden of justifying regulation of the right. *See N.Y. State Rifle*, 597 U.S. at 17. To meet that burden, the government must "affirmatively prove" that the challenged regulation is consistent with our nation's historical tradition of firearm regulation. *Id*. at 19. A court cannot simply "defer[] to legislative interest balancing." *Id*. at 26; *see also id.* at 27 ("[C]ases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach."). Instead, the State needs to prove historical regulations are "relevantly similar" to *how* the challenged regulation burdens a person's right to carry firearms and *why* the government is imposing the challenged regulation. *Id*. at 29. The Court elaborated:

> To be clear, analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so "risk[s] endorsing outliers that our ancestors would never have accepted." *Drummond v. Robinson*, 9 F. 4th 217, 226 ([3d Cir.] 2021). On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

*Id*. at 30 (first alteration in original). Courts "must . . . guard against giving postenactment history more weight than it can rightly bear." *Id*. at 35. In *N.Y.*

*State Rifle*, the Court considered, among other things, historical evidence from the Reconstruction generation in 1868 to hold New York's licensing law, which required an applicant to demonstrate a special need for self-defense, was unconstitutional. *Id*. at 64-66, 70.[5]

In *Rahimi*, the United States Supreme Court recognized that our nation's tradition of firearm regulation permits the "temporary disarmament" of persons who pose a "clear" danger of "misusing firearms." 602 U.S. at 699, 698, 690. The *Rahimi* Court rejected the argument that a person could be disarmed because they are not "responsible." *Id*. at 701-02. But the Court found an appropriate analog in founding era surety laws, which "authorized magistrates to require individuals suspected of future misbehavior to post a bond," and affray statutes, which generally prohibited "'riding or going armed, with dangerous or unusual weapons, [to] terrify[ ] the good people of the land.'" *Id*. at 695 (citing 4 WILLIAM BLACKSTONE, COMMENTARIES *251), 697 (alterations in original) (quoting 4 BLACKSTONE, *supra*, at *149). *Rahimi* concerned the constitutionality of a federal statute, 18 U.S.C. § 922(g)(8), which prohibits someone subject to a civil restraining order from possessing firearms or ammunition. Like the statute before

---

[5] The United States Supreme Court has not decided the extent to which a court should rely on "the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868" or on the public understanding of the right in 1791 when the Second Amendment was ratified. *N.Y. State Rifle*, 597 U.S. at 37; *accord Rahimi*, 602 U.S. at 692 n.1.

us, section 922(g)(8) is a temporary limitation on the right to bear firearms. Unlike the statute before us, temporary disarmament under section 922(g)(8) is not the consequence of criminal convictions like we have here.

*Rahimi* did not involve, or suggest the Second Amendment prohibits, "laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse." 602 U.S. at 698 (citing *Heller*, 554 U.S. at 626); *see Heller*, 554 U.S. at 626-27 & n.26; *see also Kanter v. Barr*, 919 F.3d 437, 451, 464-65 (7th Cir. 2019) (Barrett, J., dissenting) ("History is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns.").

Here, the trial court allowed McLellan's and Holloway's as-applied challenge to proceed for a determination of whether they individually pose a credible threat to public safety like the defendant in *Rahimi*. *See* CP at 145-46; *see Rahimi*, 602 U.S. at 698. The dissent appears to endorse this approach. Dissent at 13 n.4, 18 (citing *Rahimi* and arguing historical regulations were "limited to preventing violent behavior by people who were individually found to be dangerous").

We disagree. While the individualized findings in *Rahimi* supported disarmament in a civil restraining order proceeding unconnected to a criminal charge, that is not the backdrop we have here. Instead, in postconviction cases like

7

the ones now before us, courts must first determine whether the legislature may disarm a category of people, without an individualized assessment of each person's dangerousness, based on the type of conviction at issue. This is because a threshold question before the court under the Second Amendment is whether "a challenged *regulation*" fits within our "'historical tradition of firearm regulation.'" *Rahimi*, 602 U.S. at 691 (emphasis added) (quoting *N.Y. State Rifle*, 597 U.S. at 17). To answer that question, we begin with the nature of the regulation, i.e., whether "laws at the founding regulated firearm use to address particular problems" and whether our law "does so to an extent beyond what was done at the founding," *id.* at 692—not whether individual circumstances justify application of our law in any particular case. This turns on the category of conviction on which disarmament is based, and not facts specific to the individual dangerousness of McLellan and Holloway. As such, this case can be resolved as a matter of law, based on the pleadings.

The parties agree that DUI is extremely dangerous and potentially deadly, but McLellan and Hollway emphasize that DUI is "dangerous *because of the act itself*, not because a DUI offender has a supposed propensity for gun violence." *See* CP at 121. However, the parties do not meaningfully dispute that "[t]he history of laws regulating the use and carrying of firearms by the intoxicated goes back to the earliest days of our nation." Mark Anthony Frassetto, *The Historical*

*McLellan and Holloway v. Brown*, No. 103799-6

*Regulation of Intoxicated Firearms Possession and Carry: A Response to F. Lee Francis's "Armed and Under the Influence: The Second Amendment and the Intoxicant Rule After* Bruen*"*, 108 MARQ. L. REV. 531, 540 (2024); *see also id*. at 540-57 (collecting laws prohibiting carrying guns while intoxicated and regulating public intoxication).[6]  Based on historical intoxication laws, McLellan and Holloway concede "RCW 9.41.040(2)(a)(i)(D) passes the 'why' test" but contend that the law "fails the 'how' test" based on the burden it imposes.  Resp'ts' Answering Br. at 35-36.

RCW 9.41.040(2)(a)(i)(D) temporarily restricts a category of people our legislature determined pose a special danger of misuse of firearms.  *See, e.g.*, LAWS OF 2023, ch. 295, § 1(4).  The State contends RCW 9.41.040(2)(a)(i)(D) "fits well within at least three enduring historical principles: (1) restricting firearm possession for categories of people with a heightened risk of violence; (2) restricting firearm possession for people convicted of serious crimes; and (3) restricting firearm possession for those likely to abuse alcohol."  Opening Br. of Nicholas W. Brown (Opening Br.) at 18.  McLellan and Holloway contend the

---

[6] Additionally, at least one study has concluded that "prior convictions for DUI and other alcohol-related crimes were associated with a large increase in risk of arrest for crimes of all types, including violent and firearm-related crimes."  Garen J. Wintemute et al., *Firearms, Alcohol and Crime: Convictions for Driving Under the Influence (DUI) and Other Alcohol-Related Crimes and Risk for Future Criminal Activity Among Authorised Purchasers of Handguns*, INJ. PREV. 3 (Jan. 30, 2017), https://web.archive.org/web/20200709153215id_/https:/injuryprevention.bmj.com/content/injury prev/early/2017/01/27/injuryprev-2016-042181.full.pdf [https://perma.cc/B75C-M89J].

State must provide a much more specific "historical analogue for support that the founding generation would have considered alcohol-based offenses serious enough to warrant categorical and total disarmament or worse." Resp'ts' Answering Br. at 33. But "a 'historical twin' is not required." *Rahimi*, 602 U.S. at 701 (quoting *N.Y. State Rifle*, 597 U.S. at 30). We hold that the State's historical analogs are sufficient to uphold the law.

First, the State calls to our attention a historical tradition of disarming groups of people deemed dangerous by the legislature based on federal circuit court decisions upholding the federal felon-in-possession statute, 18 U.S.C. § 922(d)(l). *See* Opening Br. at 23-26 (collecting cases). We recognize there is a historical tradition of disarming groups of people who pose a heightened risk of danger, particularly where there is a plausible link to physical violence. *See United States v. Duarte*, 137 F.4th 743, 759-60 (9th Cir. 2025) (en banc), *cert. denied*, 223 L. Ed. 2d 556 (2026); *cf. Range v. Att'y Gen. U.S.*, 124 F.4th 218, 230 (3d Cir. 2024) (noting the lack of evidence showing "that food-stamp fraud is closely associated with physical danger"). The courts of this nation have also recognized that for centuries, states have limited firearm use by people who are intoxicated. *See, e.g., Wolford v. Lopez*, 116 F.4th 959, 985 (9th Cir. 2024) (citing various Reconstruction-era prohibitions on the carry of firearms while intoxicated), *cert.*

*granted in part*, 146 S. Ct. 79 (2025); *Antonyuk v. James*, 120 F.4th 941, 1030 (2d Cir. 2024) (same), *cert. denied*, 145 S. Ct. 1900 (2025).[7]

These cases analyzing our historical traditions show that groups of people can be constitutionally disarmed "without having to perform 'an individualized determination of dangerousness as to each person in a class of prohibited persons.'" *Duarte*, 137 F.4th at 760. We are mindful that under *N.Y. State Rifle*, deference to the legislature's determination that a category of people are dangerous is inappropriate. 597 U.S. at 26. But our legislature's findings are instructive and helpful in demonstrating the danger posed by those who repeatedly drive while intoxicated. We conclude that this firearm prohibition is similar to prohibitions recognized in our nation's history and traditions.

Second, the State asks us to recognize a historical tradition of restricting firearm possession for people convicted of serious crimes. McLellan and Holloway contend the founders would not have considered alcohol-related offenses to be serious crimes. We recognize that since the founding era, criminal laws have traditionally imposed far more severe penalties on people convicted of felonies than restrictions on firearm possession. *See generally Medina v. Whitaker*, 439

---

[7] The United States Supreme Court is considering whether 18 U.S.C. § 922(g)(3), the federal statute that prohibits possession of firearms by a person who is "an unlawful user of or addicted to any controlled substance" violates the Second Amendment in *United States v. Hemani*, *pet. for cert. filed*, No. 24-1234 (U.S. June 2, 2025) (quoting 18 U.S.C. § 922(g)(3)), *cert. granted*, 146 S. Ct. 326 (2025).

U.S. App. D.C. 294, 913 F.3d 152, 158 (2019) ("it is difficult to conclude that the

public, in 1791, would have understood someone facing death and estate forfeiture

to be within the scope of those entitled to possess arms").  In addition, the

historical analogs recognized in *Rahimi*—affray statutes and going armed laws—

are relevant here.  602 U.S. at 698 ("When an individual poses a clear threat of

physical violence to another, the threatening individual may be disarmed.").

These historical traditions demonstrate that categories of people have been

temporarily disarmed when they are shown to be dangerous through their serious

criminal convictions.  But here, we do not understand the State to argue that

legislators may disarm any category of persons deemed generally not

"responsible"—an approach the U.S. Supreme Court has rejected.  *Id.* at 701-02.

Rather, the State contends the legislature has the constitutional authority to disarm

groups of people whose convictions demonstrate they "'are not law-abiding and

are unwilling to obey the law.'"  Opening Br. at 40 (quoting *United States v.*

*Jackson*, 110 F.4th 1120, 1126 (8th Cir. 2024), *cert. denied*, 145 S. Ct. 2708

(2025)).  Here, the recidivist nature of the drunk driving convictions, coupled with

the legislature's specific finding regarding the danger they pose, supports a

determination that RCW 9.41.040(2)(a)(i)(D) fits within the founding-era tradition

of regulating certain serious, nonviolent offenses that nonetheless pose "'real

danger of public injury from individuals.'"  *Jackson*, 110 F.4th at 1127 (quoting 2

*McLellan and Holloway v. Brown*, No. 103799-6

BERNARD SCHWARTZ, THE BILL OF RIGHTS: A DOCUMENTARY HISTORY 665 (1971)).

Third, the State asks us to recognize a historical tradition of disarming individuals likely to abuse alcohol. McLellan and Holloway contend the limit of the legislature's power is "'a ban on carrying firearms while an individual is *presently* under the influence.'" Resp'ts' Answering Br. at 35 (quoting *United States v. Connelly*, 117 F.4th 269, 282 (5th Cir. 2024)). We recognize a tradition of preventing the harmful consequences of the combined use of alcohol with firearms and a more recent tradition of restricting firearm access for those suffering from alcohol dependence. *See* Opening Br. at 10-11, 49-54 (collecting laws). Further, we agree with the State that RCW 9.41.040(2)(a)(i)(D) "is not triggered by the status of having a chemical dependency, but rather by a person's having repeatedly taken the dangerous and reckless *action* of driving while drunk." Reply Br. at 29. None of these traditions in isolation might be sufficient to justify disarming recidivist DUI offenders like McLellan and Holloway, but we do not consider our nation's historical traditions in isolation, particularly when the legislature is tackling a uniquely modern problem.

Taken together, our nation's history of limiting the firearms rights of those who have been convicted of serious crimes and those who have a history of dangerous use of intoxicants, such as repeatedly driving while under the influence,

13

is sufficient justification for the regulation here. We hold that the State has shown RCW 9.41.040(2)(a)(i)(D)'s temporary disarmament of recidivist drunk drivers is consistent with this nation's historical tradition of disarming groups of people presenting a special danger of misuse.[8]

CONCLUSION

The "Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *N.Y. State Rifle*, 597 U.S. at 30. Under the Second Amendment, the temporary firearm prohibition for recidivist drunk drivers in RCW 9.41.040(2)(a)(i)(D) is constitutional without an individualized assessment of McLellan's or Holloway's dangerousness. We reverse and remand to the superior court for entry of judgment on the pleadings in favor of the State.

---

[8] We would reach the same outcome even if, as the dissent claims, "[t]he history and tradition of firearm restrictions . . . was limited to preventing violent behavior by people who were individually found to be dangerous." Dissent at 18. As discussed above, individualized findings have not historically been required in the postconviction context. And even if they were required, a vehicle is a dangerous instrument when driven under the influence. Likewise, driving under the influence has a plausible link to physical violence in the same way that combining the use of alcohol and a firearm does. The dissent questions our use of the phrase "plausible link to physical violence." *See* dissent at 8. By this phrase, we mean more than a possible or speculative connection. Consequently, when the State proves beyond a reasonable doubt that a person has driven under the influence, twice within seven years, our legislature may temporarily disarm them to prevent future violent behavior.

_González, J._

González, J.

WE CONCUR:

_Stephens, C.J._

Stephens, C.J.

_____

_____

_____

_Melody, J._

Melody, J.

_Montoya-Lewis, J._

Montoya-Lewis, J.

_Madsen, J.P.T._

Madsen, J.P.T.

15

No. 103799-6

WHITENER, J. (dissenting)—Who is among "the people" whose right "to keep and bear arms" is protected by the Second Amendment? U.S. CONST. amend. II. Most recently, in *United States v. Rahimi*, the U.S. Supreme Court said, "[W]e conclude only this: An individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." 602 U.S. 680, 702, 144 S. Ct. 1889, 219 L. Ed. 2d 351 (2024). The question of what is considered a "credible threat" in a Second Amendment analysis remains unanswered. Today, the majority relies on dicta to extend the State's ability to restrict an individual's Second Amendment right to keep and bear arms to include those who have never been and may never be convicted of any violent conduct against another person. Majority at 1 (citing *District of Columbia v. Heller*, 554 U.S. 570, 626-27, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008)). However, it is clear that *Heller* did not decide the question of *who* may possess firearms, nor did the reference in dicta to "longstanding prohibitions on the possession of firearms by felons and the mentally ill" mean the legal presumption given to the law at issue here is irrebuttable. 554 U.S. at 626. The majority goes too far. I respectfully dissent.

The Second Amendment right presumptively "belongs to all Americans." *Id.* at 581. "'Individual self-defense is "the *central component*" of the Second

Amendment right.'" *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 29, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022) (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 767, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010) (quoting *Heller*, 554 U.S. at 599)). In *N.Y. State Rifle*, the U.S. Supreme Court provided a framework to determine where a person's right to bear arms may be limited, stating, "Our holding decides nothing about who may lawfully possess a firearm." *Id.* at 72 (Alito, J., concurring). *N.Y. State Rifle* requires that we decide first whether the text of the Second Amendment applies to a person and their proposed conduct, and if it does, "the Constitution presumptively protects that conduct." *Id.* at 24. It is the government's burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19. The government is then required to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24. Only then "may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* at 17 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10, 81 S. Ct. 997, 6 L. Ed. 2d 105 (1961)).

Respondents Geoffrey McLellan and Jackson Holloway were separately convicted at least twice of driving under the influence (DUI) in a seven-year period.

Opening Br. of Nicholas W. Brown (Opening Br.) at 12. As a result of those DUI convictions, the State denied both respondents a license to carry a concealed firearm under RCW 9.41.040(2)(a)(i)(D). *Id.* at 13. The legislature passed the law in 2023 after hearing evidence that recidivist drunk driving may be a predictive risk factor for future firearm violence.[1] *Id.* at 6. Respondents challenged the law as a violation of their Second Amendment right to keep and bear arms. *Id.* at 12-13. The State argued that the law is consistent with the nation's history of restricting firearm access among individuals who pose a heightened risk of danger to the public, who have been convicted of a serious crime, and/or who misuse alcohol in a way that may cause danger to others. *Id.* at 1-2. The State argued and the majority agrees that there was no violation of the respondents' Second Amendment right to carry and bear arms. I disagree because *N.Y. State Rifle* requires the State to identify "a well-established and representative historical *analogue*" that is "enough to pass constitutional muster." 597 U.S. at 30. The State has failed to do so. Therefore, the respondents' Second Amendment rights were violated.

---

[1] The same provision criminalizes firearm possession by individuals convicted of domestic violence, stalking, cyberstalking, cyberharassment, or animal cruelty. RCW 9.41.040(2)(a)(i)(D).

I.     RCW 9.41.040(2)(a)(i)(D) restrictions on the Second Amendment

right to bear arms must have a historical analog

The Second Amendment grants Americans the right to possess firearms independent of their participation in military service and to use firearms "for traditionally lawful purposes, such as self-defense within the home." *Heller*, 554 U.S. at 577. The government may regulate firearms if "the regulation is consistent with this Nation's historical tradition of firearm regulation." *N.Y. State Rifle*, 597 U.S. at 17. RCW 9.41.040(2)(a)(i)(D) falls within the scope of the Second Amendment as it restricts a person's right to possess firearms. It is therefore the State's burden to show the law falls within the nation's historical tradition of firearm regulation. *Id.* Two questions guide a historical analysis: "whether modern and historical regulations impose a comparable burden on the right of armed self-defense [(the how)] and whether that burden is comparably justified" (the why). *Id.* at 29. "[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue,* not a historical *twin.*" *Id.* at 30. However, courts should not "'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.'" *Id*. (alteration in original) (quoting *Drummond v. Robinson*, 9 F.4th 217, 226 (3d Cir. 2021)).

*McLellan and Holloway v. Brown*, No. 103799-6
Whitener, J., dissenting

In July 2023, the Washington State Legislature passed RCW 9.41.040(2)(a)(i)(D). According to the State, recidivist drunk driving correlates with a heightened risk of firearm violence and there are fewer firearm-related crimes in states that ban firearm possession among recidivist drunk drivers. Opening Br. at 6-8. In support of this assertion, the State indicates that across the United States at least 4 jurisdictions restrict firearm use by individuals who have been convicted of multiple DUIs and another 11 jurisdictions place restrictions on firearm possession by individuals suffering from alcohol dependence.[2] *Id*. at 10-11. The State also claims that "at least 47 states have passed laws bringing recidivist drunk driving within the federal felon-in-possession statute, 18 U.S.C. § 922(d)(1)." Reply Br. at 17. The statute bans firearm possession among those convicted of a crime punishable by more than one year in prison. Some states require four DUIs to trigger the federal law, while others require only one. In some states disarmament is permanent and in others only temporary. Andrew G. Bowen et al., *Relation of Driving Under the Influence Laws to Access to Firearms Across US States*, 111 AM. J. OF PUB. HEALTH (2021), https://ajph.aphapublications.org/doi/full /10.2105/AJPH.2020.305995.

---

[2] MD. PUB. SAFETY CODE § 5-L33(B)(4); 18 PA. CONS. STAT. § 6105(C)(3); MASS. GEN. LAWS ch. 140, § 129B; MASS. GEN. LAWS ch. 90, § 24(1)(a)(1); D.C. CODE § 7-2502.03; ALA. CODE § 13A-L L-72; HAW. REV. STAT. § 134-7(C)(L); IND. CODE § 35-47-4-1; KAN. STAT. § 21-6301(9), (13); MO. REV. STAT. § 571.070; N.J. STAT. § 2C:58-3; OHIO REV. CODE § 2923.13(A)(4); S.C. CODE § 16-23; TENN. CODE ANN. § 39-17-1316; TEX. GOV'T CODE § 411.172; W. VA. CODE § 61-7-7(a)(2).

To further support their position, the State cites *United States v. Goins*, a federal court decision that specifically considered whether disarming a person with multiple DUI convictions is constitutionally permissible. Opening Br. at 27-28 (citing 118 F.4th 794 (6th Cir. 2024)). In *Goins*, the Sixth Circuit Court of Appeals upheld a felony statute, 18 U.S.C. § 922(g)(1), as applied to a defendant who had been convicted at least three times of driving under the influence (as well as drug possession, public intoxication, third-degree criminal mischief, and driving with a suspended license). 118 F.4th at 796-97. The court noted the disarmament was limited to the defendant's probation period and his "prior convictions for the same dangerous conduct—driving under the influence—evince a likelihood of future dangerous conduct." *Id.* at 804. The court concluded the defendant posed "a danger to public safety" because of his repeated DUIs and held it was constitutional to suspend his right to possess firearms. *Id*. at 804-05.

In another federal case, a district court in the Eastern District of Pennsylvania reached the opposite conclusion as the court in *Goins*, holding that restricting firearm possession under 18 U.S.C. § 922(g)(1) was unconstitutional as applied to a defendant who had been arrested for three DUIs. *Williams v. Garland*, No. 17-cv-2641, 2023 WL 7646490 (E.D. Pa. Nov. 14, 2023). The court concluded that "historical regulations on persons deemed dangerous do not present a sufficient

historical analogue without showing that the regulated conduct itself is analogous to Plaintiff's." *Id*. at *4. The court rejected the relevance of historical laws banning presently intoxicated people from possessing firearms because those laws restricted firearm possession only until the person was no longer intoxicated. *Id.* at *5. It added that because the Supreme Court previously held that a DUI "cannot be considered a crime of violence because it lacked a mens rea requirement," a "DUI cannot be categorically defined as a crime of violence for which there may be historical support for Second Amendment restrictions." *Id.* (citing *Leocal v. Ashcroft*, 543 U.S. 1, 4, 125 S. Ct. 377, 160 L. Ed. 2d 271 (2004)).

Here, the State argues that RCW 9.41.040(2)(a)(i)(D) falls within the historical traditions of disarming categories of people (1) "whom the legislature determines would pose a heightened risk of danger if armed," (2) "who are likely to abuse alcohol," and (3) "convicted of serious crimes." Opening Br. at 1. The majority agrees entirely with the State and holds "that the State's historical analogs are sufficient to uphold the law." Majority at 10. I disagree. The State has not shown that the first or second of these traditions are sufficiently analogous to RCW 9.41.040(2)(a)(i)(D) to satisfy *N.Y. State Rifle.* Furthermore, the third tradition justifies categorical restrictions only on those convicted of *violent* crimes, and a DUI does not qualify as a violent crime.

II        A Second Amendment restriction requires a clear threat of physical

violence

"When an individual poses a clear threat of physical violence to another, the

threatening individual may be disarmed." *Rahimi*, 602 U.S. at 698. In *Rahimi*, the

U.S. Supreme Court upheld "[a] federal statute prohibit[ing] an individual subject to

a domestic violence restraining order from possessing a firearm if that order includes

a finding that he 'represents a credible threat to the physical safety of [an] intimate

partner,' or a child of the partner or individual." *Id.* at 684-85 (third alteration in

original) (quoting 18 U.S.C. § 922(g)(8)). The State argues that RCW

9.41.040(2)(a)(i)(D) is constitutional because it is sufficiently analogous to the same

"surety" and "affray" laws the U.S. Supreme Court relied on in *Rahimi.* Opening Br.

at 1, 22. The majority agrees, finding "there is a historical tradition of disarming

groups of people who pose a heightened risk of danger, particularly where there is a

*plausible link* to physical violence." Majority at 10 (emphasis added). The majority

does not adequately explain why DUI convictions create a "plausible" expectation

of potential, future firearm misuse or why the conclusion that a person who drives

under the influence will one day misuse firearms is anything more than speculative.

The U.S. Supreme Court requires the State show that there is "a credible threat to

the physical safety of another" that would warrant a restriction on an individual's

8

Second Amendment right to keep and bear arms. *Rahimi*, 602 U.S. at 702. The State

has failed to show the existence of any such link here.

McLellan and Holloway were both convicted of having two or more DUIs.

Opening Br. at 12. Neither individual carried firearms or committed violent acts.

The State cites several studies that do not directly discuss the relationship between

DUIs and firearm violence. *Id.* at 6-10. The cited studies are not persuasive or helpful

in answering the issue before us. One study considered the prevalence of general

alcohol use in intimate partner violence. Marlene C. Lira et al., *Alcohol Policies and*

*Alcohol Involvement in Intimate Partner Homicide in the U.S.*, 57 AM. J. PREV. MED.

(2019), https://pmc.ncbi.nih.gov/articles/PMC6642831/ [https://perma.cc/5BJW-

CX5Y]. A second study concluded that "measures of individual, family, and

neighborhood substance use—particularly for illicit drugs—increased the risk of

becoming a victim of firearm homicide among Philadelphia adolescents." Emma E.

McGinty & Daniel W. Webster, *The Roles of Alcohol and Drugs in Firearm*

*Violence*, 177 JAMA INTERN. MED. (2017),

https://jamanetwork.com/journals/jamainternalmedicine/article-abstract/2594799.

A third study surveyed the literature on the misuse of firearms while actively

intoxicated. Charles C. Branas et al., *Alcohol Use and Firearm Violence*, 38

EPIDEMIOL. REVS. (2016), https://pubmed.ncbi.nlm.nih.gov/26811427. A DUI

recidivist certainly may be dangerous. However, the dangerous conduct addressed in *Rahimi* had a historical analog to the Second Amendment right to keep and bear arms for self-defense. There is no such historical analog for driving under the influence.

The "central component" of the Second Amendment right is individual self-defense. *Heller*, 554 U.S. at 599 (emphasis omitted). The State here, unable to show "a credible threat to the physical safety of another" to warrant temporary disarmament consistent with the Second Amendment, argues that RCW 9.41.040(2)(a)(i)(D) falls within the same historical tradition as surety and affray laws. *Rahimi*, 602 U.S. at 690; Opening Br. at 21-23. The State fails, however, to show that either the "why" or the "how" of RCW 9.41.040(2)(a)(i)(D) is sufficiently analogous to those regulations.

The "why" of surety and affray laws was to prevent people from possessing firearms if they had shown they had or could have *used those firearms* in a way that was dangerous to others.[3] *Rahimi*, 602 U.S. at 698-99. While affray laws existed to

---

[3] In precolonial times, "surety" laws were "[w]ell entrenched in the common law" and "could be invoked to prevent all forms of violence." *Rahimi*, 602 U.S. at 695. Some surety laws required bonds from those armed with an "'offensive and dangerous weapon.'" *Id*. at 696 (quoting former MASS. REV. STAT. ch. 134, § 16 (1835)). Additionally, precolonial "going armed" or "affray" laws prohibited carrying "dangerous or unusual weapons" for the purpose of terrifying others. *Id*. at 697. Those who broke affray laws faced imprisonment and/or forfeiture of their weapons. *Id*. Common law and statutory laws pre- and post-Revolutionary War incorporated affray laws into the colonies and states. *Id*. at 697-98.

redress only the immediate violent misuse of a specific dangerous weapon, firearms,

RCW 9.41.040(2)(a)(i)(D) has a very different purpose of restricting all firearm

access by a person who has not acted violently. *Id*. at 697. Affray laws, in particular,

regulated people who had "terrif[ied]" others *with* "'dangerous or unusual

weapons.'" *Id.* (quoting 4 WILLIAM BLACKSTONE, COMMENTARIES *149). The goal

of these laws was to curb "conduct [that] disrupted the 'public order' and 'le[d]

almost necessarily to actual violence.'" *Id*. (second alteration in original) (quoting

*State v. Huntly*, 25 N.C. 418, 421-22 (1843)). In fact, the very word "affray" is

"[d]erived from the French word 'affraier,' meaning 'to terrify.'" *Id*. (quoting 4

BLACKSTONE, *supra*, at *145). The phrase implies the disarmed person had some

intent to cause harm with their weapon of choice, providing a clear connection to the

Second Amendment right of self-defense. The State has not met its burden here to

show that the "how" of surety and affray laws is sufficiently analogous to RCW

9.41.040(2)(a)(i)(D).

Similarly, the "why" of surety laws was to be "a form of 'preventive justice,'"

laws that "could be invoked to prevent all forms of violence, including spousal

abuse," and "also targeted the *misuse of firearms*." *Id*. at 695-96 (emphasis added)

(citing 4 BLACKSTONE, *supra*, at *251). Here, the State relies on the logic of early

laws that disarmed groups of people based on ethnicity or religion (i.e., all Native

11

American or Catholic people) as support for the proposition that categorical disarmament is historically permissible. Opening Br. at 23-24; *United States v. Duarte*, 137 F.4th 743, 759 (9th Cir. 2025), *cert. denied*, 223 L. Ed. 2d 556 (2026). The *Duarte* court found such disarmament laws "would likely be unconstitutional today under *other* parts of the Constitution," and the State here agrees. 137 F.4th at 760; Opening Br. at 24-25. Yet the State argues that the logic of those now unconstitutional laws should control the as-applied analysis here. Opening Br. at 23-25. The majority finds this argument persuasive. Majority at 10-11. However, even accepting the legitimacy of these unconstitutional laws as potential analogs, the "why" of such categorical disarmament is not sufficiently similar to the "why" of RCW 9.41.040(2)(a)(i)(D).

Early U.S. lawmakers disarmed groups of people because they feared potential political dissidence. *Duarte*, 137 F.4th at 761. Under this "modern-day [firearm] regulation" the State disarms people with multiple DUI convictions without even a showing of a "historical precursor[]" that is "analogous enough to pass constitutional muster." *N.Y. State Rifle*, 597 U.S. at 30. I do not find this regulation to be consistent with our nation's historical tradition, nor am I persuaded by the State's use of studies that use predictions of a person's potential, future dangerous behavior based on nonviolent and unrelated past criminal conduct, to

restrict an individual's Second Amendment right to keep and bear arms. The State

has not met its burden here to show that the "why" of surety and affray laws is

sufficiently analogous to RCW 9.41.040(2)(a)(i)(D).

Unlike surety and affray laws, RCW 9.41.040(2)(a)(i)(D) does not curb the

actual source of the danger. In *Rahimi*, the Court considered the traditions of surety

and affray laws to uphold a firearm restriction where the defendant faced domestic

*violence* charges. 602 U.S. at 686-87. The Court found that "taken together, the

surety and going armed laws confirm what common sense suggests: When an

individual poses a clear threat of *physical violence to another*, the threatening

individual may be disarmed." *Id*. at 698 (emphasis added). The Court reviewed

surety and affray laws and showed that early governments contemplated some kind

of connection between the conduct and the weapon (i.e., surrendering the actual

weapon).[4] The reason the connection is needed is because the "'central component'"

of the Second Amendment right is individual self-defense. *N.Y. State Rifle*, 597 U.S.

at 29 (emphasis and internal quotation marks omitted) (quoting *McDonald*, 561 U.S.

at 767). The constitutional presumption protects the person and their proposed

conduct. Therefore, any regulation that places a restriction on the Second

---

[4] Furthermore, both surety and affray laws "involved judicial determinations of whether a particular defendant likely would threaten or had threatened another with a weapon." *Rahimi*, 602 U.S. at 699. *Rahimi* "was explicitly based on the fact that a court had made an *individualized* finding of dangerousness." Resp'ts' Answering Br. at 21; *see Rahimi*, 602 U.S. at 702 ("An individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment.").

Amendment right to bear arms for self-defense must fit within our "historical tradition of firearm regulation." *Id.* at 24. A criminal conviction can constitute an individualized finding of dangerousness for Second Amendment purposes, but only where there is a showing that the criminal conduct meets the threshold of a "credible threat" of physical violence. RCW 9.41.040(2)(a)(i)(D) has no such historical analog because those convicted of DUIs under this statute do not present a credible threat of *physical violence*.

The State can restrict the recidivist drunk driver from consuming alcohol, and from being in possession of motor vehicles while in possession of alcohol or after consuming alcohol to a level of impairment, but for the State to extend the restriction to the constitutional right to keep and bear arms a historical analog is needed. Surety and affray laws do not provide that analog. Therefore, the State has not met its burden to show that the "how" or the "why" of surety and affray laws is sufficiently analogous to RCW 9.41.040(2)(a)(i)(D).

III.    Second Amendment restrictions target "firearm misuse"

In this case, we are not asked to answer whether the misuse of alcohol and firearm possession is dangerous. It is. The question here is whether the firearm prohibition of RCW 9.41.040(2)(a)(i)(D) is sufficiently analogous to historical regulations of firearms and alcohol use in the DUI context to permit a restriction

under the Second Amendment. The respondents, McLellan and Holloway, did not misuse firearms. They are recidivist DUI offenders who misused alcohol to a level of impairment when they drove motor vehicles. Following the analogy the State provides to affray laws suggests the State could restrict recidivist drunk drivers from consuming and accessing alcohol and operating motor vehicles. The analogy does not justify a restriction on the individual's right to bear arms.

A historical twin is not required to restrict a Second Amendment right. The State claims the articles it provides show that "'frequent risky alcohol use'" is a "'particularly strong risk factor[] for future violence.'" Opening Br. at 4 (alteration in original) (quoting LAWS OF 2023, ch. 295, § 1(4)). According to the State, the legislature reasonably relied on this data when it passed RCW 9.41.040(2)(a)(i)(D) and reached the same conclusion as the *Goins* court in the Sixth Circuit that "prior convictions for the same dangerous conduct—driving under the influence—evince a likelihood of future dangerous conduct." *Id.*; *Goins*, 118 F.4th at 804. However, even though a historical twin is not required to restrict a Second Amendment right, the crime of DUI and the crime of domestic violence are relevantly similar only if one's metric is generally "dangerous crimes." They are not relevantly similar if the applicable metric is a dangerous crime that can "pose a credible threat to the physical

safety of another" within the context of disarmament under the Second Amendment. *Rahimi*, 602 U.S. at 702.[5]

The State acknowledges that a prohibition on carrying firearms *while* intoxicated is not the same as a prohibition on carrying firearms *after* driving while intoxicated, yet argues this tradition shows the government has long imposed general restrictions aimed at mitigating "'the dangers of mixing alcohol and firearms.'" Opening Br. at 53-54 (quoting *Wolford v. Lopez*, 116 F.4th 959, 986 (9th Cir. 2024), *cert. granted in part*, 146 S. Ct. 79 (2025)). Yet, according to the State and the majority RCW 9.41.040(2)(a)(i)(D) "is consistent with the historical tradition of regulations that mitigate the danger of alcohol combined with guns." *Id*. at 49; *see* majority at 13-14. These restrictions have included prohibiting (1) establishments that sell liquor from "'keeping gunpowder,'" (2) the sale of alcohol to militia members (all of whom were presumably armed), and (3) perhaps most commonly, carrying firearms while intoxicated. Opening Br. at 49-50 (quoting *Wolford*, 116 F.4th at 985). The State notes as additional support that today "11 states restrict firearm access for those suffering alcohol dependence." *Id*. at 54. However, those

---

[5] "For instance, a green truck and a green hat are relevantly similar if one's metric is 'things that are green.' They are not relevantly similar if the applicable metric is 'things you can wear.'" *N.Y. State Rifle*, 597 U.S. at 29 (citation omitted).

laws temporarily removed access to firearms from people who were *presently* intoxicated. Resp'ts' Answering Br. at 17-18.

We are not asked to decide whether mixing alcohol and firearms is dangerous. It clearly is, but that is not the case before us. Early laws aimed to prevent harm caused by *current* intoxication like DUI laws required refraining from driving and only until a person was no longer intoxicated. While early alcohol-and-firearm laws focused on controlling the threat of imminent harm by forbidding access to weapons over a very short period, RCW 9.41.040(2)(a)(i)(D) restricts access to firearms for five years without a finding that the individual poses or would "pose a credible threat to the physical safety of another." *Rahimi*, 602 U.S. at 702.

Early American lawmakers were aware that people who consumed alcohol were likely to do so again, but they did not elect to deprive people of firearms for long periods of time solely because they were habitual alcohol users. *See United States v. Connelly*, 117 F.4th 269, 279 (5th Cir. 2024) ("Even as the Founders disarmed Catholics and politically disaffected citizens, they left ordinary drunkards unregulated … neither Congress nor the states disarmed alcoholics."). The State cites no authority that shows the founders disarmed individuals on an ongoing basis for alcohol misuse. The majority interprets early alcohol-related firearm laws as "a tradition of preventing the harmful consequences of the combined use of alcohol

with firearms and a more recent tradition of restricting firearm access for those suffering from alcohol dependence." Majority at 13. However, respondents were not convicted of "alcohol dependence" or combining firearms and alcohol. The respondents were convicted of multiple DUIs, and the State has failed to show that a DUI is sufficiently related to early Second Amendment alcohol and firearm regulations.

IV. Not all felonies require Second Amendment restrictions

The U.S. Supreme Court has stated that "longstanding prohibitions on the possession of firearms by felons and the mentally ill" are "presumptively lawful." *Heller*, 554 U.S. at 626-27 & n.26. It is not a categorical bar, but a rebuttable presumption. The conduct of people who drive under the influence can be categorized as "dangerous," but that does not make the conduct "violent." In Washington, a DUI is defined as a "serious traffic offense," drawing a distinction from violent crimes. RCW 9.94A.030(45)(a). The history and tradition of firearm restrictions, as explained above, was limited to preventing violent behavior by people who were individually found to be dangerous. It is true that respondents' recidivist DUI actions placed themselves and others in physical danger. However, the legislature's purpose in passing RCW 9.41.040(2)(a)(i)(D), by the State's own characterization, was not to punish recidivist drunk drivers for creating a public

danger but to prevent *potential future firearm misuse* based on data showing a correlation between DUIs and violence. Opening Br. at 29. The State relies on past "dangerous" conduct to infer a likelihood of future "violent" conduct.

The State argues that RCW 9.41.040(2)(a)(i)(D) is constitutional due to the nation's history of disarming individuals who have been convicted of serious crimes. *Id.* at 40. Respondents argue their criminal activities were nonviolent and the State must show they are individually dangerous to justify disarmament. Resp'ts' Answering Br. at 21-26; Reply Br. at 8-9. The State counters that "the only federal appellate decisions upholding as-applied challenges to possession bans have been for crimes that are not 'closely associated with physical danger,'" such as marijuana possession and lying on an application for public benefits. Opening Br. at 36 (quoting *Range v. Att'y Gen. U.S.*, 124 F.4th 218, 230 (3d Cir. 2024)).

The majority considers this evidence sufficient reason to uphold the law because "the recidivist nature of the drunk driving convictions, coupled with the legislature's specific finding regarding the danger they pose, supports a determination that RCW 9.41.040(2)(a)(i)(D) fits within the founding-era tradition of regulating certain serious, nonviolent offenses that nonetheless 'pose real danger of public injury from individuals.'" Majority at 12 (internal quotation marks omitted) (quoting *United States v. Jackson*, 110 F.4th 1120, 1127 (8th Cir. 2024), *cert. denied*,

145 S. Ct. 2708 (2025)). Interestingly, neither the State nor the majority specifically identifies early nonviolent offenses that led to disarmament, other than those laws that merited estate forfeiture or execution, such as forgery and horse theft. *Duarte*, 137 F.4th at 756-57.

The State is depriving individuals of their Second Amendment constitutional right to bear arms *before* they commit a violent crime on the assumption that one day they might. The Second Amendment does not permit such preventative action. *Rahimi*, 602 U.S. at 700. Rather, the Second Amendment grants firearm rights to all citizens unless they are convicted of crimes that show the individual "has been found to pose a credible threat to the physical safety of others." *Id*. No such showing exists in this case.

Where respondents have been convicted only of dangerous but nonviolent crimes, the national tradition of disarming felons does not provide a sufficient analog to RCW 9.41.040(2)(a)(i)(D). The majority finds that "since the founding era, criminal laws have traditionally imposed far more severe penalties on people convicted of felonies than restrictions on firearm possession," concluding that is sufficient reason to uphold the restriction here. Majority at 11. However, the fact "[t]hat Founding-era governments punished some nonviolent crimes with death does not suggest the *particular* (and distinct) punishment" of disarmament "is rooted in

20

our Nation's history and tradition." *Range v. Att'y Gen. U.S.*, 69 F.4th 96, 105 (3d Cir. 2023), *vacated and remanded sub nom. Garland v. Range*, 144 S. Ct. 2706 (2024). The right to bear arms is a constitutional right and restrictions on such rights must be "comparably justified" by the nation's historical tradition. *N.Y. State Rifle*, 597 U.S. at 29. *N.Y. State Rifle* warned us not to "'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.'" *Id.* at 30 (quoting *Drummond*, 9 F.4th at 226).

RCW 9.41.040(2)(a)(i)(D) is an outlier. It violates the respondents' constitutional rights under the Second Amendment to the U.S. Constitution. I would affirm the trial court and remand.

_____
Whitener, J.

_____
Johnson, J.

_____
Gordon McCloud, J.

_____
Mungia, J.